Donald L. CAMP, Appellant,

v.

Richard SCHWEIKER (Successor to Patricia Harris), Secretary of Department of Health and Human Services, Appellee.

No. 79–2076.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1980.

Decided March 17, 1981.

Art Dodrill, Attorney at Law, Little Rock, Ark., for appellant.

Alice Daniel, Asst. Atty. Gen., Washington, D.C. George W. Proctor, U. S. Atty., A. Doug Chavis, Asst. U. S. Atty., Little Rock, Ark. Alan M. Grochal, Atty., Dept. of Health, Education and Welfare, Baltimore, Md., for appellee.

Before HENLEY and McMILLIAN, Circuit Judges, and BECKER,[*] Senior District Judge.

WILLIAM H. BECKER, Senior District Judge.

Plaintiff-appellant Donald L. Camp (Camp) appeals from a judgment of the district court affirming the final decision of the Secretary of Health and Human Services (Secretary)[1] denying Camp disability insurance benefits and supplemental security income (SSI) benefits, based on alleged disability. Because we conclude that the decision of the Secretary was not based upon substantial evidence supporting the burden of proof imposed by law on the Secretary, the decision of the district court will be reversed and remanded with directions to remand the cause to the Secretary for further proceedings.

I.

On January 26, 1977, appellant Camp applied for disability insurance benefits and supplemental security income benefits based on alleged disability, beginning October 15, 1975 because of conditions affecting his back, legs, feet and arm. (Transcript of administrative proceedings, hereinafter Tr., at 72, 76.) The application of Camp for benefits was denied initially on March 17, 1977, and after reconsideration, on June 6, 1977. (Tr. at 80, 83.)

A hearing on notice before an administrative law judge was held on March 1, 1978, at which Camp appeared personally and with his attorney. (Tr. at 16, 20.)

At the hearing before the administrative law judge (ALJ) (Tr. at 25–56), Camp testified as follows: that he was 32 years of age, 6 feet 3½ inches tall and weighed 230 pounds (Tr. at 25); that he completed 9 grades of school (Tr. at 26); that he quit school because he couldn't get along with the teachers and "couldn't learn nothing" (Tr. at 26); that his mathematical ability is fair; that he can't divide, but that he can make change (Tr. at 66); that he can't make out (read) some words; that his writing ability is below average (Tr. at 27); that he is married and has three children living with him (Tr. at 28); that he has not been able to work since October 15, 1975, and relies on food stamps and his wife's wages from working for support of him and his family (Tr. 28, 29); that he tried to work as a self-employed tile setter in 1976, but did not make much money because he couldn't do anything or lift anything (Tr. at

[*] The Honorable William H. Becker, United States Senior District Judge for the Western District of Missouri, sitting by designation.

1. The appeal in this action was filed against Joseph Califano as Secretary of the Department of Health, Education and Welfare. The Department of Health, Education and Welfare has been redesignated the Department of Health and Human Services. Department of Education Organization Act, Pub.L.No. 96–88, § 509, 93 Stat. 668 (1979). Joseph Califano was succeeded by Patricia Roberts Harris as Secretary, who in turn has been succeeded by Richard Schweiker, who has been substituted as appellee under Rule 43(c)(1), F.R.A.P.

28); that when he drives a car his leg gives out and his wife has done most of the driving for the past two or three years (Tr. at 29, 30); that on a typical day he gets up in the morning if he can, watches television, tries to do a little exercise on the doctor's advice, hurts after two or three minutes, then lies down in bed and works his legs (Tr. at 30–31); that he lies down to rest when hurting a lot, takes medicine (pills and aspirin); "fools around the house" and has to sit down again, but doesn't clean the house or make up his bed; that his wife does that and his mother and father come by and help with the house cleaning (Tr. at 31); that he tried to work in the yard setting a fire his wife had to put out; that he can't pick up except once in a while, then he gets to hurting; that he can't pick up his kids (Tr. at 32); that his wife makes up the bed before she goes to work, washes clothes and stuff like that (Tr. at 32); that he usually makes a sandwich for lunch and tries to cook supper by putting on a pot of beans, cooks pork chops or something like that (Tr. at 32); that he reads the paper, watches television quite a bit, and when home babysits the kids, and listens to the radio (Tr. at 33); that he likes to fish but can't anymore because he can't hold the fishing pole but likes to go with his wife (Tr. at 33); that he doesn't belong to any clubs or attend meetings (Tr. at 34); that on his doctor's advice, he tries to walk outside a quarter of a mile when its pretty, but sometimes can't (Tr. at 34); that in the past he worked on a pipeline off and on since 1965 (Tr. at 34), but it was awful heavy work and he hurt his back in 1965 or 1966 (Tr. at 35); that he ran heavy equipment on the pipeline, oiled and lifted and the like, operated a bulldozer, ran a tack rig with a welding machine for the welders, hustled heavy oak 6 × 6 skids, 4 feet long (Tr. at 35), and in 1965 or 1966 hurt his back doing that (Tr. at 36); that in 1974 he was unemployed; that in 1976, made $1,351 as a tile setter (Tr. at 38), with hired help and his wife's help, work he learned to do in 1962 and 1963 (Tr. at 38); that when he had to lift cement or carry tile he hired help to do it or had his wife's help (Tr. at 38); that he bid on the tile setting jobs as a subcontractor but became unable to continue that work (Tr. at 39); that he lost money and moved back to his home in Perryville (Tr. at 39); that he can't bid or do any more tile setting jobs but would love to, but loses money when he doesn't work and hires others (Tr. at 40); that he believes he has an arthritic condition which affects him in his elbows, ankles, back and left chest; that he was taken to the hospital a while back with big knots on his elbows (Tr. at 40); that he can't straighten his elbows, his hands draw on him all the time (Tr. at 41); that the knot in his (right) elbow is hard, becomes soft and sometimes goes away and comes back in the area of the fourth lumbar vertebrae (located by the ALJ) (Tr. at 41); that it has gotten worse in the last 6 or 7 months and usually a big knot comes on the elbow of his left arm too and hurts like a heart attack and stays sore (Tr. at 41–42); that his right elbow has chipped bone in it from a broken arm in 1974 (Tr. at 42); [that his right knee gives him a lot of trouble, from a motorcycle wreck, Mrs. Camp interjected under oath (Tr. at 43)]; that he takes two ascriptin every 4 hours, prescribed by Dr. Dornenberg for rheumatoid arthritis and 1 or 2 darvon a day prescribed by Dr. Hyatt (Tr. at 43–44); that his most comfortable position is lying down in an upholstered chair with his legs elevated, but when hurting lying down is best (Tr. at 44) on his back on a firm mattress (Tr. at 45); that because of his back he can't bend and can hardly stoop, and must squat to pick up something from the floor (Tr. at 45); that he consults Dr. Dornenberg for his arthritic condition (Tr. at 46); that he saw Dr. Dornenberg 4 or 5 times and Dr. Hyatt 7 or 8 times (Tr. at 47); that he tries to walk ¼ mile a day and has trouble first with his ankles and feet (Tr. at 48); that he is uncomfortable after sitting about 45 minutes and would like to scoot up and lay in a chair (Tr. at 48); that he couldn't sit in a chair or at a bench in the same position and

work with his hands without lifting for 2 hours (Tr. at 48–49); that he could stand probably 20 or 30 minutes (Tr. at 49); that to squat down and get up he has to pull on something (Tr. at 49); that he uses a walking stick to walk and has fallen walking, and fell 2 months ago out the back door (Tr. at 49); because his knee gave way and that he has trouble all the time with his legs going to sleep (Tr. at 50); that he can't pick up over 5 pounds (Tr. at 50); that he doesn't try to pick up or carry for any distance (Tr. at 51); that his ability to grip any time of the day is bad because his hands draw up and become numb although he exercises his grip with "silly putty" on advice of Dr. Dornenberg (Tr. at 52); that the leaders in his wrist feel like they are trying to pull his fingers in to his arm (Tr. at 52–53); that they draw an hour or two at the time and he exercises them and gets in a tub of hot water (Tr. at 54); that reaching overhead causes discomfort in his elbow and left shoulder (Tr. at 54); that his condition is surely no better than in October 1975 and he has become more limited in what he can do since then and could do better 6 months ago (Tr. at 54–55); that his condition is much worse than in 1976 when he did a little tilesetting (Tr. at 56); that he could not set tile now (Tr. at 56).

From personal observation, claimant's wife Mrs. Shirley Rose Camp (Tr. at 57–62) corroborated the testimony of her husband Mr. Camp about her employment, her work, care, and assistance to Mr. Camp in driving the car, in his work in setting tile, his and her income, and the assistance of Mr. Camp's father and mother with the housework.

Written medical reports from Benjamin Hyatt, M.D., a general practitioner, Peter R. Dornenberg, M.D., an orthopedic surgeon, and John M. Hundley, M.D., an orthopedist, were admitted into evidence at the hearing.

Dr. Hyatt reported that he had last examined Camp in January 1977; that Camp had complained of back troubles; that no physical limitation of the back was noted in physical examination; that no objective findings substantiated any alleged back trouble, that Camp lacked five to ten degrees of the extension of his right elbow; and that Camp should avoid crawling because of chronic dermatosis of his right knee. (Tr. at 106.)

Dr. Dornenberg reported that he examined Camp on May 3, 1977, and that Camp has a 2+ lumbro-sacral area tenderness, a lack of about 25 degrees of complete extension and a lack of perhaps 15 degrees of complete flexion of the right elbow, some narrowing of the L5–S1 disc space, and concluded that Camp "is having a generalized synovitic flare-up compatible with rheumatoid disease" and would require surgery in the foreseeable future on his feet and perhaps on his right elbow. (Tr. at 107.)

Dr. Hundley reported that he examined Camp in December 1977, and that Camp had a history of injuries to Camp's back and right elbow, lumbrosacral tenderness, flexion of the trunk to be 75% of normal, side bending to be 75% of normal, and a loss of 5 degree extension of the right elbow, that x-rays revealed some ossification in the medial and acubital fossa of the right elbow, lumbarization of the posterior elements of S1 and considerable narrowing of the intravetrebral [sic] disc space at L4,5 and S1. (Tr. at 115.) The diagnosis by Dr. Hundley of Camp's condition was as follows: "1. Degenerative disc disease of the lumbar spine without neurological changes 2. hyperuresemia 3. Probable early, but inactive rheumatoid arthritis." (Tr. at 115.) The written report of Dr. Hundley contains the following opinion:

OPINION: From the foregoing history, physical, lab and x-ray examination it is my opinion this man should be seen by a psychiatrist. He also has a positive rheumatoid arthritis test, but no evidence of activity of any arthritis. His history, although extremely bizarre may be in keeping with rheumatoid arthritis, but at this

time no specific diagnosis of such can be made. The U.K. Acid test is very high indicative of gout for which he should consult his family physician. The degenerative disc disease is the only positive diagnosis other than the hyperuresemia that I can make and this would prevent him from carrying out work requiring heavy lifting of 100 lbs. or more or carrying 100 lbs. frequently. He can frequently pick up or carry 50 lbs. He can stand some 5–6 hours, walk or sit 5–6 hours without difficulty in my opinion. He can sit and use his hands with no restriction whatsoever. He can also sit and operate repititiously [sic] knee and foot controls to machinery. He can bend occasionally, squat infrequently, crawl frequently, climb occasionally, reach above shoulder level continuously. Provided he is psychiatricly [sic] cleared he can work in unprotected heights and around moveing [sic] machinery. There is no restriction to his working in inclimate [sic] weather, dust, fumes or gasses [sic]. He can drive an automobile or some other equipment. (Tr. at 115–116.)

Harold D. Love, Ph.D., a vocational expert, testified at the administrative hearing, after reviewing the written reports of Dr. Dornenberg and Dr. Hundley, and after listening to the testimony of Camp and Mrs. Camp. (Tr. at 63.)

The examination of Dr. Love by the administrative law judge included the following:

Q. Alright, sir. Alright. At this time, Mr. Dodrill [attorney for Camp], I will ask Dr. Love hypothetical questions. Mr. and Mrs. Camp, these hypothetical questions are just that. That is assumed that a certain—a set of certain circumstances are true and then he will answer. He's not making a judgment as to his ability to work.

The first hypothetical is this, Dr. Love, that you have been present throughout the hearing, and you have heard the claimant's testimony concerning his limitations.

For the first hypothetical, let us assume that Mr. Camp does have all of the limitations that he testified to, particularly, that he has a great limitation of motion in both joints of the elbow, his ankles, primarily, and of course, the low back, and that his testimony is corroborated or verified by medical evidence which we'll have in file either now or in the future.

But assuming that he has all of the limitations that he testified to, number one, could he return to his former job as a self-employed tile setter?

A. No, sir. In my opinion, he could not.

Q. Could he return to his former job as a pipeline worker?

A. No, sir.

Q. Alright, sir. Could he perform any type of work which exists in significant numbers in this country?

A. It would have to be in a shelter type situation, Judge. Like a self-service station attendant, assuming that he has the mathematical ability to make direct change.

Q. Alright, sir. Alright. Now, then for the second hypothetical and you partially answered that, I think. But let us assume that I will hold or I will find that from the medical evidence that there is no impediment or impairment of such a serious nature that would prevent the claimant from performing sedentary or very light work activities. Under that set of circumstances and, of course, considering his background, his education and transferrable work skills, would your answer be the same as it was a moment ago about the self-service station operator, or would there be other jobs that the claimant could perform?

A. Under those assumptions, Judge, there would be other jobs that Mr. Camp would have skills to perform.

Q. Alright. Could you give us some examples of those jobs?

A. Like going to a factory type situation, a shoe factory for example, a compa-

ny in Conway. He lives close to Conway. Burk Manufacturing. They manufacture school furniture, lifting, he would be required to lift a piece of a chair and sand it or weld it. He would not actually have to be a welder.

Rockton [phonetic] Company in Conway where the manufacturing of cardboard boxes. Franklin Electronics in North Little Rock, for example, where they would not pick up more than five pounds.

But these are some of the industries employing people having these skills that you mentioned.

(Tr. at 66–67.)

At the administrative hearing, the motion of Camp for psychological and psychiatric examinations was granted. (Tr. at 69–70.) The record of the hearing was reopened on April 20, 1978 to admit into evidence the written psychological evaluation of Camp by Patrick Caffey, Ph.D., and the written psychiatric evaluation of Camp by Robert M. Thompson, M.D. (Tr. at 70–71.)

Dr. Caffey, a clinical psychologist, evaluated Camp in April 1978 and reported that psychological tests he gave Camp indicated that Camp was functioning in the borderline range of mental retardation, which Caffey felt however to be an underestimate of Camp's apparent basic average level capability, and also indicated depressed mood,

considerable tension, anxiousness, and felt discomfort. (Tr. at 128.) Dr. Caffey also reported that the personality tests "indicated an underlying morbid apprehension regarding his own welfare and his apparent conflict between dependency needs and untoward feelings may cause concern with somatic problems" and that Camp's "concern about his condition and depressed mood could result in morbid personal notions." (Tr. at 128.) Dr. Caffey evaluated Camp's psychological impairment generally as moderate in severity in the Social Security form entitled "Supplemental Questionnaire As To Residual Functional Capacity." [2] (Tr. at 129–30.)

Dr. Thompson, a psychiatrist, evaluated Camp in April 1978. In his written evaluation he reported: "In conclusion, this man does manifest significant impairment in his functioning due to his somatic preoccupations and depression. He has not responded to therapy. He is competent. Diagnosis: Depressive neurosis with anxiety and conversion features 300.4." (Tr. at 135.)

Dr. Thompson rated Camp's psychiatric impairment in the supplemental questionnaire form as mild in two areas, moderate in five areas, moderately severe in four areas. (Tr. at 136–37.)

Thereafter, a letter report concerning Camp's physical condition from Fred Robertson, M.D., was added to the claim file. (Tr. at 139.)

**2.** The "Supplemental Questionnaire As To Residual Functional Capacity" is a form consisting of six questions, with a seventh question entitled "Comments", for a narrative report. The questions are as follows: 1) "Estimated degree of impairment of claimant's ability to relate to other people"; 2) "Estimated degree of restriction of daily activities, e. g., ability to attend meetings (church, lodge, etc.), work around the house, socialize with friends and neighbors, etc."; 3) "Estimated degree of deterioration of personal habits of claimant"; 4) "Estimated degree of constriction of interests of claimant"; 5) "Based on your evaluation of claimant's *psychiatric status* [emphasis in original], please give your opinion as to the degree of limitation in the claimant's ability to do the following on a sustained basis: a) Comprehend and follow simple instructions, b) Perform work requiring frequent contact with others, c) Perform work where contact with others would be minimal, d) Perform simple tasks, e) Perform complex tasks, f) Perform repetitive tasks, g) Perform varied tasks.". For each of the questions 1–4, and each subpart of question 5, the person completing the questionnaire is asked to circle one of the following answers: "None", "Mild", "Moderate", "Moderately Severe", or "Severe". These terms are defined on the questionnaire form as follows: "*None*: no impairment in this area; *Mild*: suspected impairment of slight importance which does not affect ability to function; *Moderate*: an impairment which affects but does not preclude ability to function; *Moderately Severe*: an impairment which seriously affects ability to function; *Severe*: extreme impairment of ability to function."

The administrative law judge made the following findings in his memorandum decision dated July 24, 1978:

1. According to information given by the claimant, he was born on November 15, 1945, making him 32 years of age; completed the ninth grade in school; and has principally been employed in heavy pipeline construction work.

2. The claimant meets the special earnings requirement at all pertinent times herein and will continue to meet that requirement at least through September 30, 1978.

3. The claimant has degenerative disc disease of the lumbar spine but without any neurological changes. This condition would not prevent the claimant from performing medium to heavy type work.

4. The claimant probably has early rheumatoid arthritis but there is no evidence of this desease [sic] becoming active.

5. The claimant has a high uric acid level which is indicative of gout.

6. The claimant's mental condition is one of depressive neurosis with anxiety and conversion features. This condition, in itself, would not prevent the claimant from performing work activities involving simple and repetative [sic] tasks.

7. The above-mentioned impairments, whether considered singly or in combination, are not sufficiently severe so as to prevent the claimant from performing work activities as testified to by the vocational consultant at the hearing. These work activities include that of a self-service station operator, a shoe factory work [sic], a school furniture factory worker, and an electronics worker. These jobs exist in significant numbers in the local area.

8. The claimant was not disabled within the meaning of the Social Security Act at any time prior to the date of this decision.

(Tr. at 12.)

The Appeals Council of the Social Security Administration approved the decision of the administrative law judge on August 28, 1978. (Tr. at 3.) That decision is the final decision of the Secretary.

Camp brought this action pursuant to 42 U.S.C. § 405(g), in the United States District Court for the Eastern District of Arkansas, for review of the final decision of the Secretary. In an unreported order dated December 18, 1980, the district court granted the motion of the Secretary for summary judgment, affirmed the final determination of the Secretary, and dismissed the complaint of Camp with prejudice. This appeal followed.

II.

The question we must decide is whether the final decision of the Secretary is supported by substantial evidence. 42 U.S.C. § 405(g).

Camp contends that the evidence of psychological and psychiatric impairments was not available at the March 1, 1978 administrative hearing, that the hypothetical questions asked of the vocational expert did not include any consideration of psychological and psychiatric impairments, and that therefore the opinion of the vocational expert was not substantial evidence upon which the final decision of the Secretary could be based.

The Secretary contends that it was not necessary to include the psychological and psychiatric evaluations in the hypothetical questions the administrative law judge asked the vocational expert because the administrative law judge could properly later conclude on the basis of those evaluations that there was no impairment, because of any alleged psychological and psychiatric condition, in the ability of Camp to perform simple repetitive tasks.

III.

"We must uphold the Secretary's decision if it is supported by substantial evidence on

the record as a whole. 42 U.S.C. § 405(g)." *Gilliam v. Califano*, 620 F.2d 691, 693 (8th Cir. 1980). "For the reviewing court, substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Stephens v. Secretary of HEW*, 603 F.2d [36] at 41 (8th Cir. 1979). *See also Celebrezze v. Bolas*, 316 F.2d 498, 501 (8th Cir. 1963)." *Wroblewski v. Califano*, 609 F.2d 908, 912 (8th Cir. 1979) and *Gilliam v. Califano, supra*, 620 F.2d at 693.

The standards for disability insurance benefits were clearly set forth by this Court in *Wroblewski v. Califano, supra*, 609 F.2d at 912–13, as follows:

> This court has stated a three-fold requirement for the determination of disability under 42 U.S.C. § 423 (1976): (1) a medically determined physical or mental impairment which has or will last at least twelve months; (2) inability to engage in any substantial gainful activity; and (3) the inability must be by reason of the impairment. *Stephens v. Secretary of HEW, supra*, at 41; *Johnson v. Califano*, 572 F.2d 186, 187 (8th Cir. 1978); *Dressel v. Califano*, 558 F.2d 504, 506–07 (8th Cir. 1977); *Timmerman v. Weinberger*, 510 F.2d 439, 442 (8th Cir. 1975).

> The claimant has the burden of establishing the existence of her disability, but that burden shifts to the Secretary upon a showing by claimant of an inability to perform her past occupation due to a medically determinable ailment. *Stephens, supra* at 41; *Lewis v. Califano*, 574 F.2d 452, 455 (8th Cir. 1978); *Timmerman, supra* at 443. Once such a showing has been made the Secretary must then demonstrate that the claimant can perform some other type of substantial gainful employment. *Boyer v. Califano*, 598 F.2d 1117, 1118 (8th Cir. 1979); *Brinker v. Weinberger*, 522 F.2d 13, 17 (8th Cir. 1975); *Celebrezze v. Bolas, supra*, 316 F.2d at 507. [Footnotes omitted.]

*See also Gilliam v. Califano, supra*, 620 F.2d at 693.

■ The evidence, including the testimony of the vocational expert at the hearing established that Camp was unable to perform his previous occupations of pipeline equipment operator and tilesetter. (Tr. at 66.) Therefore, the district court properly found that the claimant Camp met his primary burden of proof of inability to perform his past occupations because of medically determinable ailments. (Record at 54.) This finding was fully supported by the evidence of the claimant, his wife and the examining and treating physicians, without consideration of the later developed psychological and psychiatric evidence. Therefore, as the district court correctly concluded, the "burden shifted to the Secretary to establish by a preponderance of the evidence that there was work available in the national economy that [Camp] could perform in his disabled condition." *Gilliam v. Califano, supra*, 620 F.2d at 693. The Secretary must base that judgment upon the testimony of a vocational expert. *Warner v. Califano*, 623 F.2d 531, 532 (8th Cir. 1980); *Boyer v. Califano*, 598 F.2d 1117, 1119 (8th Cir. 1979).

We conclude that the decision of the Secretary was deficient in several respects.

First, it is clear from the record that the vocational expert did not consider the later developed psychological and psychiatric impairments of Camp in expressing his opinion, in answer to the hypothetical questions posed by the administrative law judge. The psychiatric and psychological reports were not prepared until after the vocational expert testified at the hearing before the administrative law judge. In *Stephens v. Secretary of Health, Education and Welfare*, 603 F.2d 36, 41 (8th Cir. 1979), it was stated that

> the vocational expert's testimony was fatally deficient in that the hypothetical question failed to precisely set out all of Stephens' impairments. *See Behnen v. Califano*, 588 F.2d 252, 255 (8th Cir. 1978);

*Lewis v. Califano,* 574 F.2d 452, 456 (8th Cir. 1978); *Daniels v. Mathews,* 567 F.2d 845, 848 (8th Cir. 1977).

In *Daniels v. Mathews, supra* at 848, this Court held:

> We think it is fundamental when the ALJ [administrative law judge] uses a hypothetical question in examining the vocational expert, that the ALJ relate with precision the job capacity and opportunity to the physical and mental impairment of the particular claimant. [Footnotes omitted.]

The administrative law judge failed to do so here. In the hypothetical question, he asked the expert to assume that Stephens could do "light or sedentary work with such limitations as are noted in the record." The exact nature of these "limitations" was undisclosed and, thus, we have no way of determining whether the vocational expert recognized all of Stephens' disabilities.

*See also Gilliam v. Califano, supra,* 620 F.2d at 694, in which a substantially similar hypothetical question was held to be deficient.

█ Because the hypothetical questions failed to precisely set out all of Camp's impairments, including the psychological and psychiatric impairments, they were deficient. Therefore, the opinions of the vocational expert could not be relied upon by the Secretary as substantial evidence that there was work in the national economy that Camp could perform in his disabled condition.

█ The decision of the Secretary was also deficient in that the evidence of physical and mental impairments were considered separately. "Evidence as to claimant's impairments must be considered as a whole and cannot be fragmented so as to diminish their combined impact." *Lewis v. Califano,* 574 F.2d 452, 456 (8th Cir. 1978). The mental disabilities of Camp were never considered by the vocational expert. In the decision of the Secretary, it is stated that the mental condition of Camp, *"in itself,* would not prevent the claimant from performing work activities involving simple and repetative [sic] tasks." (Tr. at 12, emphasis added.) The decision of the Secretary next recites that "the above mentioned impairments, whether considered singly or in combination, are not sufficiently severe so as to prevent the claimant from performing work activities as testified to by the vocational consultant at the hearing." (Tr. at 12.) Because the vocational expert never considered the psychological and psychiatric mental disabilities of Camp, even on the basis that the alleged mental disabilities alone "would not prevent claimant from performing work activities involving simple and repetative [sic] tasks," the conclusion of the Secretary is not supported by substantial evidence.[3] Further, it is shown that the administrative law judge considered first the physical impairments of Camp, and then, separately, without further submission of a proper hypothetical question to the vocational expert, the mental impairments of Camp.

█ The conclusion of the administrative law judge that Camp could perform work activities involving simple and repetitive tasks is based, in part, upon the "Supplemental Questionnaire As To Residual Capacity" completed by Dr. Thompson. In reference to the counterpart questionnaire relating to physical disability, this Court has recently stated that "although such forms are admissible, they are entitled to

---

3. The district court also considered separately the physical and mental impairments of Camp. In its opinion dated December 18, 1979, it is stated:

> It is clear that the reports of Drs. Hyatt, Dornenberg and Hundley contain substantial evidence upon which the Administrative Law Judge could reasonably conclude that the plaintiff's physical condition was not disabling within the meaning of the Social Security Act. While the Court thinks that the evidence as to the plaintiff's mental condition presents a closer question, there exists substantial evidence on that point to support the decision of the Administrative Law Judge. (Record at 54.)

little weight in the evaluation of disability. *Landess v. Weinberger,* 490 F.2d 1187 (8th Cir. 1974). The form does not constitute 'substantial evidence' upon the record as a whole." *Gilliam v. Califano, supra,* 620 F.2d at 693.

### IV.

42 U.S.C. § 405(g) provides in relevant part that in reviewing a final decision of the Secretary, a court "shall have the power to enter, upon the pleadings and the transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

For the foregoing reasons, it is hereby

ORDERED that the judgment of the district court be, and it is hereby, affirmed in part and reversed in part with directions to remand the cause to the Secretary for rehearing and further proceedings consistent with this opinion.