**Laurel L. LACROIX, Plaintiff,**

v.

**Joanne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A.03–11858–WGY.**

United States District Court,
D. Massachusetts.

Jan. 5, 2005.

David F. Bander, Bander & Bander, Boston, MA, for Plaintiff.

Jeremy M. Sternberg, United States Attorney's Office, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

This is an action under Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3). The plaintiff, Laurel L. Lacroix ("Lacroix"), seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for Disability Insurance Benefits and for Supplemental Security Income payments. Lacroix argues that the Commissioner's decision is not supported by substantial evidence and is erroneous as matter of law. She therefore requests that this Court reverse the Commissioner's decision or remand the case to the

Social Security Administration for a new administrative hearing.

## I. BACKGROUND

Lacroix was born on September 10, 1956. R. at 77. She has a high school education, and she worked as a bartender and waitress from 1978 until January 2001, when she states that she was terminated because she could not perform her job duties. *Id.* at 90. *Id.* at 16 (copy of the hearing officer's decision). She complained of right knee pain in 1998, right hip pain and pain in the left side in 1999, and pain in her right shoulder and arm, nightly fever, constant fatigue, and aching bones in 2000. *Id.* In 2001, she complained of pain all over her body. *Id.* Lacroix came to suffer from fibromyalgia and depression, and she claims the combination rendered her unable to work. *Id.* Her treating physicians are Dr. Scott Henderson ("Dr.Henderson") of the Hawthorne Medical Clinic and Dr. William Guptill ("Dr.Guptill") of Saint Anne's Hospital Pain Management Clinic. *Id.* at 92–93.

### A. Medical Evidence

Although Lacroix's medical history reveals a number of medical problems, the Court focuses only on those related to her alleged disability. As the Commissioner notes, *see* Def.'s Mem. [Doc. No. 9] at 3 n. 1, Lacroix's brief quotes from medical records regarding medical problems unrelated to her alleged disability in a way that misleadingly suggests that they are related. *See* Pl.'s Mem. [Doc. No. 7] at 4. First, Dr. Henderson's March 31, 2000 notes diagnose pain, but for cholelithiasis (gallstones), which caused epigastric pain, not for fibromyalgia. R. at 167. Second, Dr. Henderson prescribed Percocet on Au-

gust 8, 2000, but for pain associated with an outbreak of herpes zoster, not with any conditions that Lacroix associates with her disability. *Id.* at 168–70.

Lacroix has been treated by Dr. Henderson since August 1997. *See* R. at 92, 158. The notes from her April 15, 1999 visit indicate that she complained of pain in her right hip, ranging from 2 on a "good" day to 7 on a "bad" day on a scale of 1 to 10. *Id.* at 162. She stated that being on her feet at work increased her pain. *Id.* She also described anxiety, depressed feelings, and a tendency to wake during the night and have difficulty falling back to sleep. *Id.* In September 2000, the month when her alleged disability began, she complained of non-specific joint pain and depression, among other things. *Id.* at 187. Dr. Henderson noted that myalgias, depression, and fatigue were indicated. *Id.*[1] In her November 13, 2000 visit, Lacroix admitted that she had noticed improvement in her depression after being on medication for it. *Id.* at 195.

Dr. Henderson's notes from Lacroix's February 16, 2001 visit indicate that although he found no obvious pressure points, fibromyalgia was "possible." *Id.* at 199–200. Lacroix claims that the notes also indicate a diagnosed sleep disorder, although the Court could not find any such reference in the often illegible notes. *See id.;* Pl.'s Mem. at 4. Notes from April 3, 2001, indicate that Lacroix was less depressed, but that she complained of difficulty sleeping and of increased pain. R. at 201. Dr. Henderson prescribed Vioxx at that point. *Id.*

On May 16, 2001, Dr. Henderson noted multiple trigger points, raised the question of fibromyalgia, and prescribed Oxycontin. *Id.* at 202. At her June 15, 2001 visit,

---

1. Visits to Dr. Henderson in October 2000 dealt with conditions not relevant to this case. *See* R. at 188–93.

Lacroix complained of continuing difficulty sleeping, as well as muscle spasms in her legs. *Id.* at 203. On October 16, 2001, Lacroix told Dr. Henderson that the Oxycontin was not working, and Dr. Henderson put Lacroix on Zanaflex and morphine in addition to Oxycontin. *See id.* at 203, 208. Although Lacroix's leg cramps had improved, she was still experiencing pain, and Dr. Henderson diagnosed her with fibromyalgia. *See id.* at 204. There is no record of Lacroix seeing Dr. Henderson after October 2001.

Dr. Henderson referred Lacroix to Dr. Guptill, a pain specialist, whom Lacroix first saw on August 14, 2001. *Id.* at 212. Lacroix complained of pain all over her body, specifically in her neck, back, hip, legs, and hands. *Id.* She stated that the pain had been present for over a year, rated its intensity at nine on a scale of one to ten, and stated that with stress the level went up to ten. *Id.* She stated that heat and Oxycontin both helped with the pain. *Id.* Although she could not identify a precipitating event for the pain, she said that it started after her husband of many years unexpectedly left her. *Id.* He had since returned, but the pain remained. *Id.* She also noted her sleep difficulties, anxiety, and depression. *Id.*

Dr. Guptill's physical examination showed that Lacroix was "in no apparent distress," with full range of motion in her neck, negative straight leg raise, negative for hip or sacroiliac pain, and slight tenderness in the C4 region. *Id.* at 213. Her gait was normal, she could walk heel-to-toe, her reflexes were normal and her motor strength was normal and equal. *Id.* Dr. Guptill did diagnose Lacroix with "a component of fibromyalgia," and planned to address that ailment by weaning Lacroix off Oxycontin and having her engage in physical therapy. *Id.* He also recommended changes in medication and a fol-low-up with a pain behavioral psychologist. *Id.* at 213–14.

In the evaluation he sent to Dr. Henderson, Dr. Guptill also said, "The patient is seeking disability for her condition, which would not be encouraged at this time." *Id.*

Lacroix saw Dr. Guptill again on September 26, 2001. *Id.* at 211. She complained of increased pain (eight on a scale of one to ten), with generalized body pain, lower back pain, bilateral leg pain, and pain in her arms, feet, and shoulders. *Id.* She had multiple aches and pains. *Id.* Although Dr. Guptill gave no further diagnosis, he increased Lacroix's dosage of Oxycontin, put her on MSIR (morphine) and Zanaflex, and increased her dosage of Elavil. *Id.*

Lacroix again saw Dr. Guptill on December 18, 2001. *Id.* at 210. Dr. Guptill noted continuing complaints of "8/10 pain" and a "diagnosis of failed-back syndrome" after the insertion of a rod into her left leg following a 1977 car accident. *Id.; see id.* at 211. He increased her dosage of Oxycontin, maintained her dosage for MSIR, and also prescribed Celebrex. *Id.* at 210. He concluded: "Finally, would consider the patient stable, most likely in the immediate future and pending next clinic visit, would consider sending back to primary to write medication and only see on a bi-yearly basis." *Id.* There is no indication in the record that Lacroix ever followed Dr. Guptill's recommendations to see a pain behavioral psychologist or engage in physical therapy. *See id.* at 210–13.

Lacroix saw Dr. Guptill in April 2002 for fibromyalgia and hip pain. *Id.* at 244. Lacroix reported 10/10 pain for that day, but Dr. Guptill classified her as having 5/10 pain. *Id.* He noted that the increase in Oxycontin had not decreased her pain, and suggested that in light of the lack of "hard diagnoses," her dosage should be

decreased. *Id.* He also recommended that she return to Dr. Henderson's care. *Id.* On a return visit to Dr. Guptill in August 2002, Lacroix admitted that her fibromyalgia was "under excellent control," that her pain was down to 3/10, that she could do more activities, and that she wanted to decrease her Oxycontin dosage. *Id.* at 252.

Dr. Guptill completed a Fibromyalgia Residual Functional Capacity Questionnaire on September 24, 2002. *Id.* at 245–50. He indicated two diagnosed impairments; he stated that Lacroix suffered from bilateral hip pain and that she met the American Rheumatological criteria for fibromyalgia. *Id.* at 245. He based this assessment on clinical findings of muscular pain involving her neck, arms, legs, and back. *Id.* The symptoms he listed included multiple tender points, nonrestorative sleep, chronic fatigue, subjective swelling, frequent, severe headaches, and depression. *Id.* at 246. He described nearly constant moderate to severe bilateral pain in the lumbosachral spine, cervical spine, shoulders, arms, hips, legs, and knees/ankles/feet. *Id.* Her symptoms were "frequently" (as opposed to "never," "seldom," "often," or "constantly") severe enough to interfere with attention and concentration, *id.* at 247, and she suffered "marked" (as opposed to "no," "slight," "moderate," or "severe") limitation in the ability to deal with work stress, *id.* He estimated that she could sit continuously for thirty minutes, stand continuously for twenty minutes, and walk one city block without resting. *Id.* at 247–48.

Dr. Guptill estimated that Lacroix could sit for about two hours in an eight-hour day and stand or walk for about the same amount of time. *Id.* at 248. She would need five periods of walking around for five minutes during an eight-hour work day, would need to take four unscheduled one-hour breaks during an eight-hour

work day, and would need to be able to shift positions at will from sitting, standing, or walking. *Id.* She could occasionally lift less than ten pounds during a work day, but could only spend thirty percent of her time during an eight-hour work day doing repetitive reaching. *Id.* at 249. She could only spend fifteen percent of the time during an eight-hour work day bending or twisting. *Id.* In general, she would be apt to have "good days" and "bad days," and to be absent from work more than three times a month (the highest frequency listed on the form). *Id.*

Lacroix also saw doctors to whom she was referred by Disability Determination Services. In September 2001, she had a consultative examination with Dr. M. Anis Rahman ("Dr. Rahman"). *Id.* at 154–56. Lacroix complained of pain all over her body, constant fatigue, and depression, for which the medication that she took "help[ed] a lot." *Id.* at 154. Physical examination revealed no acute distress, and Lacroix had normal range of motion in her joints and showed no evidence of active synovitis (inflammation). *Id.* at 155. Her muscle tone and strength were normal, though there were tender points on her shoulders, elbows, heels, and knees. *Id.* at 156. A neurological examination showed her to be fully alert and oriented, with no motor or sensory deficits or deep tendon reflex problems. *Id.* Dr. Rahman's impression included fibromyalgia and depression, which improved with medication. *Id.*

Disability Determination Services also referred Lacroix for a psychodiagnostic interview with Dr. Steven Hirsch ("Dr. Hirsch") in August 2001. *Id.* at 127–30. Lacroix stated that she had a 17–year history of abusing alcohol, cocaine, and marijuana, but had stopped using all substances in 2000. *Id.* at 128–29. Examination revealed that she had good hygiene, was alert, cooperative, and oriented in all

spheres, and did not appear to be in physical discomfort. *Id.* at 128. Lacroix demonstrated clear and expressive speech, decent vocabulary skills, good memory and attention span, and appropriate aspect. *Id.* at 128–29. She was not anxious and her frustration tolerance was good. *Id.* at 129. She stated that she needed assistance with many household chores, but could attend to daily personal hygiene needs, and that she had difficulty sleeping, often sleeping during the day. *Id.* at 129. She complained of chronic depression and recent suicidal ideation. *Id.* Dr. Hirsch's diagnosis was polysubstance abuse, reportedly in remission, and mood disorder, secondary to somatic problems. *Id.* at 129–30.

Several non-examining physicians examined Lacroix's medical records. Dr. Judith Capps indicated that Lacroix had an adjustment disorder impairment for which she suffered no limitations. *Id.* at 134, 141. Dr. Howard noted that Lacroix had fibromyalgia and chronic fatigue syndrome, could occasionally lift 20 pounds, walk or stand for six hours in an eight-hour day, or sit about the same amount of time, and had limited ability to push and pull in both the upper and lower extremities. *Id.* at 146. Dr. Goulding had a similar assessment of physical limitations, except that he did not find any push and pull limitations. *Id.* at 216. He also indicated that Lacroix had "diffuse discomfort suggestive of fibromyalgia and fatigue," with "multiple tender trigger points." *Id.* at 217. Dr. Levoy diagnosed Lacroix with a mood disorder, *id.* at 227, opined that she would have moderate limitations in social functioning and concentration, but only mild restrictions regarding daily activities, *id.* at 234, and further stated that she had numerous moderate limitations with regard to mental residual functional capacity, *see id.* at 238–40.

## B. Procedural History

Lacroix filed applications for Disability Insurance Benefits and Supplemental Security Income on June 25, 2001, alleging that she had been disabled since January 31, 2001, due to fibromyalgia and depression. R. at 77–79, 259–62. At her hearing, she amended her onset date to September 30, 2000. *Id.* at 28. Her claim was denied initially and on reconsideration. *Id.* at 264–67, 269–72. She requested a hearing before an administrative law judge ("hearing officer"), which was held on October 1, 2002. *Id.* at 73–76. On May 14, 2003, after reviewing the evidence in the record, the hearing officer issued a decision affirming the denial of her applications. *Id.* at 15–22. On June 25, 2003, Lacroix filed a request for review of this decision, *id.* at 273–77, which request the Appeals Council denied on July 24, 2003, *id.* at 8–11, thereby making the hearing officer's decision the Commissioner's final decision, *see* 20 C.F.R. §§ 404.955, 404.981. Lacroix has exhausted her available administrative remedies and her case is now ripe for review. *See* Pl.'s Mem. at 3 (claiming as much); Def.'s Mem. at 2 (agreeing with Lacroix's recitation of the administrative proceedings).

## C. Hearing Testimony

### 1. Lacroix's Testimony

At the October 2002 hearing, Lacroix's attorney stated that Lacroix's fibromyalgia made her unable to work. R. at 28. Lacroix explained that she could not work because her bartending job required her to be on her feet for whole shifts and to lift cases of beer. *Id.* at 31. When the hearing officer asked why she felt she could not do other work, she responded that she felt unable to work seven-day weeks or eight-hour days, and that she slept a lot during the day. *Id.* She explained that her medication—Oxycontin and morphine—made

her sleepy, rendered her unable to drive, and impacted her attention span and memory. *Id.* at 32..She described having pain in her hips, arms, hands, neck, feet, ankles, and knees. *Id.* at 35. She had "good days" and "bad days." *Id.* at 31.

On a "good day," she would get up around 9:00 or 10:00 in the morning, take her medication, and lie down for about an hour until the medication took effect. *Id.* at 33. Her husband, who is home during the day, would help her make the coffee. *Id.* During the day she would generally take the dogs outside for a while; the rest of the day until dinner time would involve a long nap and watching a lot of movies. *Id.* Due to concentration difficulties, she would often have to rewind the movies to watch parts over again. *Id.* at 38. Her husband would help her prepare dinner, and she would be in bed by 8:00 or 8:30. *Id.* Lacroix testified that on good days she could do limited driving, and she and her husband would do food shopping together. *Id.* at 34. She stated that she was unable to do much work around the house, that her daughter took care of house cleaning, and that her daughter and husband helped with the laundry. *Id.* She also testified that she can only stand for a half-hour and sit for 20 minutes, and that she can only lift light items. *Id.* at 35.

Lacroix stated that on "bad days," which constituted about half of her days, she would stay in bed all day. *Id.* at 36.

She then explained that, due to lack of money, she did not attend therapy. *Id.* She stated that she stopped drinking when she started taking Oxycontin and morphine, *id.* at 39, and that she was taking Prozac, although she was not being treated for depression, *id.*

### 2. The Vocational Expert's Testimony

Albert Sabella ("Sabella"), a vocational consultant and vocational rehabilitation counselor, testified in his capacity as a vocational expert. R. at 40–50, 70–72. The hearing officer asked him to assume the following about Lacroix: (1) that she could perform light work; (2) that she had moderate reduction in her ability to maintain attention and concentration, deal with co-workers or supervisors, and deal with ordinary work stresses, particularly in the areas of attendance, perseverance, and pace; and (3) that she was limited by inability to understand, remember, or carry out complex or detailed instructions. *Id.* at 42. Sabella responded that although Lacroix could not return to her former work and had no transferable skills, she could perform other work, such as light cashiering, cleaning, and machine tending, jobs which existed in the regional economy in numbers of 2,500 to 3,000, 3,000, and 10,000, respectively. *Id.* at 43.

The hearing officer asked Sabella to assume that Lacroix could only do sedentary work, not light exertional work, but that she otherwise had the same limitations discussed above. *Id.* at 43–44. Sabella testified that Lacroix could work as a sedentary cashier, in an assembly and packing job, or as a machine tender, positions which existed in the regional economy in numbers of 2,000, 10,000, and 2,000 to 3,000, respectively. *Id.* at 44.

The hearing officer then asked Sabella to assume an added restriction of inability to use hands for repetitive actions, such as "simple grasping, pushing, and pulling of arm controls, and fine manipulation." *Id.* at 45. Sabella responded that Lacroix could still do the machine tending jobs. *Id.*

On cross-examination, Lacroix's attorney asked Sabella to assume that Lacroix could only do sedentary work, and that she suffered from the compound effect of the limitations listed in the Mental Residual Functional Capacity Form filled out by

non-examining physician Dr. Levoy. *Id.* at 46–47, 238. There were four levels of limitation in the form: (1) "no evidence of limitation;" (2) "not significantly limited;" (3) "moderately limited;" and (4) "markedly limited." *Id.* at 238. The form indicated evidence of impairment in every area covered. *Id.* at 238–40. It revealed "marked limitation" in ability to understand, remember, and carry out detailed instructions. Lacroix displayed "moderate limitation" in the following areas: (1) "ability to remember locations and work-like procedures;" (2) "ability to maintain attention and concentration for extended periods;" (3) "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance;" (4) "ability to work in coordination with or proximity to others without being distracted by them;" (5) "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (6) "ability to interact appropriately with the general public;" (7) "ability to accept instructions and respond appropriately to criticism from supervisors;" (8) "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" (9) "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;" (10) "ability to respond appropriately to changes in the work setting;" and (11) "ability to be aware of normal hazards and take appropriate precautions." *Id.* at 238–40. She "was not significantly limited" in any of the remaining categories. *Id.* Sabella testified that, given the compound effect of the marked and moderate limitations listed and a limitation to sedentary work, there was no work in the regional economy that Lacroix could perform. *Id.* at 47.

Lacroix's attorney then asked Sabella to examine the Residual Functional Capacity Questionnaire filled out by Dr. Guptill. *Id.* at 48–49. Sabella testified that all the limitations therein, taken together, would preclude Lacroix from working in any job in the regional economy. *Id.* at 49–50.

## II. DISCUSSION

### A. Standard of Review

When reviewing a final decision of the Commissioner, the Court must determine whether that decision was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420 (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)) (internal quotation marks omitted). The Court "must affirm the [final decision], even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Evangelista v. Sec'y of Health & Human Servs.,* 826 F.2d 136, 144 (1st Cir.1987) (quoting *Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3 (1st Cir.1987), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 713, 98 L.Ed.2d 663 (1988)) (internal quotation marks omitted).

The Commissioner has the responsibility to determine issues of credibility, to draw inferences from the record, and to resolve conflicts in the evidence, *Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.1991), and thus also has an obligation to the claimants and to the reviewing court to make full and detailed findings to support his conclusions. *Small v. Califano,* 565 F.2d 797, 801 (1st Cir.1977).

### B. Social Security Disability Standard and the Hearing Officer's Decision

In order to successfully bring a claim for Social Security disability benefits, a claimant must show that she is "disabled," as that term is defined under the Social Security Act. *Deblois v. Sec'y of Health & Human Servs.*, 686 F.2d 76, 79 (1st Cir. 1982). She meets this test when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Deblois*, 686 F.2d at 79. More specifically:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A). Furthermore,

In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

*Id.* § 423(d)(2)(B).

The Social Security Administration's regulations lay out a series of tests for determining disability. *See* 20 C.F.R. § 404.1520. The inquiry proceeds as follows:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other

work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled....

*Id.* § 404.1520(a)(4). The claimant bears the burden of proving that she is disabled at each of the first four steps. *See Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 7 (1st Cir.1982). The Commissioner, however, bears the burden of proof as to the fifth test (whether there are other jobs in the economy that the claimant can perform). *Id.*

Here, the hearing officer found that Lacroix had ceased substantial gainful employment as of September 30, 2000, the alleged date of disability. *See* R. at 15–16. He found that her fibromyalgia and depression constituted "severe" impairments within the meaning of the Commissioner's regulations, *id.* at 21 (citing 20 C.F.R. §§ 404.1520(b) & 416.920(b)), but that she did not have an impairment of listing level severity, *id.* at 21 (citing App. 1, Subpart P, Reg. No. 4). He found that "[her] allegations regarding her limitations are not totally credible" as to their severity. *Id.* at 16–17, 21. He also found that she

> retains the residual functional capacity to perform a wide range of sedentary work with the inability to understand, remember and carry out complex and detailed instructions and moderate reduction in the ability to maintain attention and concentration, deal appropriately with the public, co-workers, supervisors and the ordinary requirements of attendance, perseverance and pace.

*Id.* at 21. Thus, while he agreed that she could not perform any of her past relevant work and that she lacked transferable skills from relevant past work, *id.* at 22 (citing 20 C.F.R. §§ 404.1565, 404.1568, 416.965, 416.968), he found that there was relevant sedentary work that she could do

in the regional economy, *id.* (citing Medical–Vocation Rules 201.21 & 201.28).

**C. Lacroix's Challenge to the Hearing Officer's Decision**

**1. The Vocational Expert's Testimony**

■ Lacroix first argues that the hearing officer erred by selectively relying on portions of a medical record and by ignoring Sabella's cross examination testimony regarding whether Lacroix was disabled. Pl.'s Mem. at 7. She alleges that the hearing officer's hypothetical questions to Sabella relied on the Mental Residual Functional Capacity Form, yet included only four of the eleven moderate limitations listed therein. *Id.* To support this assertion, she claims that this form was the only evidence rating her mental limitations, and that it contained all four of the limitations that the hearing officer listed. *Id.* at 8. The hearing officer's choice is important, because Sabella testified that jobs existed in the regional economy for a person with the four limitations, but not for a person with all eleven limitations.

Lacroix argues that if the hearing officer incorporated this form into her hypothetical questions, without asking hypothetical questions based on other assumptions, then he must have accepted the form as valid. *Id.* She further argues that, as the only evidence assessing her mental limitations in detail, it is uncontroverted evidence. *Id.* Thus, the argument goes, the hearing officer erred in two ways; he ignored an uncontroverted medical report, and he chose portions of it on which to rely without specifying why other portions were not credible. *Id.* at 8–9. Alternatively, the hearing officer erred by ignoring the vocational expert's testimony regarding disability, without explaining why some testimony should be believed and other testimony should not. *See id.* at 9.[2]

---

**2.** Lacroix treats her assignments of error as

cumulative arguments rather than as alterna-

The Commissioner argues that the hearing officer's hypothetical questions, rather than relying selectively and arbitrarily on portions of the Mental Residual Functional Capacity Form, reasonably weighed that form against other medical evidence regarding Lacroix's mental condition. Def.'s Mem. at 9–10. In particular, the hearing officer pointed out that Lacroix had never been hospitalized or received therapy for her depression, that her depression improved with medication, and that she indicated improvement on several occasions. *Id.* at 10 (citing R. at 17). The Commissioner also notes the hearing officer's reliance on the results of the mental status examination by Dr. Hirsch, who found her to be alert, cooperative, and oriented in all spheres, with clear and expressive speech, decent vocabulary skills, good memory and attention span, appropriate aspect, good frustration tolerance, and lack of anxiety. *Id.* (citing R. at 17). The Commissioner faults Lacroix for failing to acknowledge this additional evidence of her medical limitations, particularly when the Mental Residual Functional Capacity Form relies to some degree on Dr. Hirsch's evaluation. *Id.*

The Commissioner also points out that the hearing officer expressly relied on the form, but considered the narrative findings at the end of it, rather than solely considering the checked boxes regarding specific limitations. *Id.* at 10–11. The narrative findings explained that Lacroix's depression "is responsive to psychiatric medication," that "psych severity" was not indicated, and that Lacroix failed to allege depression as an impairment at various stages of the benefits application process. R. at 241; *see* Def.'s Mem. at 11 (citing R. at 18, 241). The narrative

findings acknowledged the existence of limitations, but clarified that Lacroix should still have residual functional capacities to "understand and remember simple tasks," "sustain concentration and persistence on simple repetitive tasks," "interact socially adequately around simple matters," and "adapt to straightforward, simple routine stressors or changes." R. at 241.

Thus, the Commissioner argues that the hearing officer based his hypothetical questions to the vocational expert appropriately on his evaluation of the entire medical record, and that he was not required to base his decision on the expert's responses to Lacroix's attorney's hypothetical questions. Def.'s Mem. at 11–12.

The hearing officer's hypothetical questions incorporated the severe limitations from the form with respect to inability to understand, remember, or carry out complex or detailed instructions. R. at 42–44. The moderate limitations the questions posited involved "ability to maintain attention concentration, dealing with other coworkers or supervisors, and [ ] dealing with ordinary work stresses . . . [of] expectations of attendance, perseverance, and pace." *Id.* These moderate limitations can be fairly understood to overlap with the following moderate limitations in the Mental Residual Functional Capacity Form: (1) "ability to maintain attention and concentration for extended periods;" (2) "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance;" (3) "ability to work in coordination with or proximity to others without being distracted by them;" (4) "ability to complete a normal workday and workweek without interrup-

tive arguments, but they are best understood as the latter. If the hearing officer erred, he either did so by reaching an incorrect decision about what impairments existed, or,

having properly determined what the impairments were, he ignored uncontroverted testimony that those impairments rendered Lacroix "disabled."

tions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (5) "ability to accept instructions and respond appropriately to criticism from supervisors;" (6) "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." *Id.* at 238–40.

It is less clear whether the hearing officer's hypothetical questions encompassed the following moderate limitations from the form: (1) "ability to interact appropriately with the general public;" (2) "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;" (3) "ability to respond appropriately to changes in the work setting;" (4) "ability to be aware of normal hazards and take appropriate precautions;" and (5) "ability to remember locations and work-like procedures." *Id.* The Court notes that although the hearing officer's opinion intimates that the his hypothetical assumed " 'moderate' impairment in dealing appropriately with the *public,* co-workers, and supervisors," *id.* at 19 n. 2 (emphasis added), actually his hypotheticals did not include the public, *id.* at 42.

Presumably, then, it was these last five elements that made a difference in Sabella's evaluation. Without them, he believed that Lacroix could find work in the regional economy, but with them, he did not. The Court must determine whether the hearing officer was justified in finding that Lacroix's condition was sufficiently close to that described in his hypothetical questions, as opposed to that described in her attorney's questions, that Sabella's answers to the former should control.

The hearing officer directly addressed this question. He explained that the overall assessment in the Mental Residual Functional Capacity Form was closer to the his hypothetical "when taken in its entirety and including the ability to understand and remember simple tasks, sustain attention and concentration on simple repetitive tasks, interact socially adequately around simple matters and adapt to straightforward, simple routine stressors or changes." *Id.* at 20–21 n. 3.

This statement by the hearing officer presents some logical difficulties. The positive description of Lacroix's residual functional capacities is in no way inconsistent with the moderate limitations that were checked off in the non-narrative portion of the form. The positive description of Lacroix's ability to perform in certain areas of activity, so long as those activities are confined to "simple" matters, is quite consistent with "moderate" limitations in those same areas. Moreover, when Lacroix's attorney was asking Sabella hypothetical questions, the hearing officer clarified (and all parties agreed) that Sabella should interpret the term "moderate" in the Mental Residual Functional Capacity Form consistently with the definition found in some Social Security forms (but not in this form) where an impairment "effects [sic] but does not preclude functioning in a particular area." *Id.* at 46. This suggests that the hearing officer believed that Dr. Levoy (the doctor filling out the Mental Residual Functional Capacity Form) used this definition, and it is in any case the common sense definition of the word in this context. Thus, the positive and negative statements are merely opposite sides of the same coin.

The narrative statement contains more than the positive statements, however. It also describes Lacroix's responsiveness to medication, and points out that Lacroix had previously failed to list her depression as an impairment. The hearing officer could have found that these factors, combined with the descriptions of Lacroix's depression in other medical records,

showed that Lacroix's condition was less serious than might be suggested by reading the non-narrative portion of the Mental Residual Functional Capacity Form in isolation. Elsewhere in his opinion, the hearing officer emphasized, based on narrative medical evaluations, that Lacroix had never been hospitalized or received therapy for her depression, that her depression improved with medication, and that she indicated improvement on several occasions. Indeed, it is difficult to believe that Sabella would have found Lacroix to be disabled if he had been asked a hypothetical question based solely on the notes from Dr. Hirsch's examination.

 There is thus conflict in the evidence, or at least a range of reasonable interpretations thereof. As this Court has already noted, resolution of such conflicts is the province of the Commissioner. *Ortiz*, 955 F.2d at 769. The hearing officer is entitled "to piece together the relevant medical facts from the findings and opinions of multiple physicians." *Evangelista*, 826 F.2d at 144. Moreover, medical questionnaires, standing alone, "are entitled to little weight in the evaluation of disability." *Anderson v. Sec'y of Health & Human Servs.*, 634 F.Supp. 967, 972 (D.Mass.1984)(Tauro, J.) (citing, *Camp v. Schweiker*, 643 F.2d 1325, 1333–34 (8th Cir.1981), and *Gilliam v. Califano*, 620 F.2d 691, 693 (8th Cir.1980)). Emphasizing clinical findings over the questionnaire is thus perfectly reasonable. Finally, it is ultimately for the Commissioner to determine an individual's residual functional capacity, 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2), based on all of the relevant evidence, *id.* §§ 404.1545 & 416.945. Although the Commissioner may not "assess residual functional capacity based on a

bare medical record," *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir.1990), he is not "precluded from rendering common-sense judgments based on medical findings," *id.*, and he may draw inferences from the record, *Ortiz*, 955 F.2d at 769.

The worst that can be charged to the hearing officer here is that he failed to explain his reasoning with as much precision as is ideal. It is clear that the hearing officer reasonably found Lacroix's condition to resemble that suggested in his hypothetical questions, and he was therefore entitled to credit Sabella's answers to those questions, rather than his answers to Lacroix's attorney's questions. Lacroix's arguments to the effect that the hearing officer ignored Sabella's testimony are thus without merit.

### 2. Dr. Guptill's Opinions

Lacroix also argues that the hearing officer erred by failing to give controlling weight to the medical opinions of Dr. Guptill, her primary treating physician.[3] Pl.'s Mem. at 14. Alternatively, she argues that he failed to give any weight to those opinions. *Id.* at 17. The hearing officer determined that the Residual Functional Capacity Questionnaire that Dr. Guptill completed was not "probative in this case," because "his assessment is neither consistent with the physical examination of Dr. Rahman on September 27, 2001, the medical consultant, nor his own examination of the claimant on August 14, 2001." R. at 18. The hearing officer offered further reasons as well:

> [Dr. Guptill] bases his limitations primarily on the claimant's constant and severe pain in the lumbosacral and cer-

---

**3.** The Commissioner attempts to argue that Dr. Henderson, not Dr. Guptill, is Lacroix's primary treating physician. Def.'s Mem. at 12. The government's argument is without

merit; the hearing officer himself found that Dr. Guptill was Lacroix's primary treating physician, R. at 18, and that finding is based on substantial evidence.

vical spines, shoulders, arms, hips, legs, knees, ankles and feet. Yet, as recently as August 7, 2002, when he last saw the claimant, she reported only 3 out of 10 pain and the ability to do more activity. In fact, the claimant was so satisfied with her treatment that she wanted to begin reducing her medication.

*Id.*

 As Lacroix correctly notes, the hearing officer must give "controlling weight" to a treating source's medical opinion if it is well-supported and not inconsistent with the other substantial evidence in the case record. *See* 20 C.F.R. § 404.1527(d)(2) (explaining that the Commissioner generally gives more weight to opinions from treating sources than to those arising out of individual examinations), *Arroyo v. Barnhart,* 295 F.Supp.2d 214, 220–21 (D.Mass.2003) (Neiman, M.J.). "Although the opinions and diagnosis of a treating physician are not necessarily entitled to more weight than those of other medical consultants, such opinions should be considered carefully in the absence of grounds to question their reliability." *Bulpett v. Heckler,* 617 F.Supp. 850, 856 (D.Mass.1985) (citing *Sitar v. Schweiker,* 671 F.2d 19, 22 (1st Cir.1982), and *Smith v. Schweiker,* 646 F.2d 1075, 1081 (5th Cir. 1981)) (citations omitted). Similarly, the Commissioner gives more weight to the opinion of a source that has examined a claimant than to the opinion of a source that has not. 20 C.F.R. § 404.1527(d)(2).

 Lacroix argues that the hearing officer did not credit Dr. Guptill's diagnosis of fibromyalgia, and then explains at length why Dr. Guptill's opinion should be given controlling weight. *See* Pl.'s Mem. at 14–17. In particular, she suggests that the hearing officer's references to objective medical tests are inappropriate, because there are no objective medical tests for fibromyalgia. *Id.* at 15. The Court need not go into detail regarding this ar-

gument, however, because, as the Commissioner correctly points out, the hearing officer acknowledged that Lacroix had fibromyalgia and that it was a "severe" impairment. R. at 16. The hearing officer also considered the fibromyalgia to be the primary cause of the functional limitations that confined her to sedentary work. *See id.* at 18.

Lacroix also gives reasons why other medical evidence on which the hearing officer relies is either irrelevant or is outweighed by other evidence, and argues that the hearing officer gave too much weight to the opinions of state doctors who only examined her once, and that he failed to consider the record as a whole. Pl.'s Mem. at 16. She further argues that the hearing officer failed to take account of evidence regarding her failed back syndrome and post femoral rodding status. *Id.* at 16–17.

Lacroix's arguments fail, however, because the hearing officer could reasonably have concluded that Lacroix was capable of doing sedentary work based solely on Dr. Guptill's assessments. As the Commissioner correctly points out, neither Dr. Guptill nor Dr. Henderson has ever offered an opinion of disability. Def.'s Mem. at 13.

Even if Dr. Guptill's medical opinions, as expressed in the Residual Functional Capacity Questionnaire, constituted a finding of disability, the hearing officer could have discounted them as inconsistent with his contemporaneous findings on physical examination, and by extension could have dismissed as irrelevant Sabella's testimony based on the limitations described in the Residual Functional Capacity Questionnaire. During Dr. Guptill's August 2002 examination, Lacroix admitted that her fibromyalgia was "under excellent control," that her pain was down to 3/10, that she could do more activities, and that she

wanted to decrease her Oxycontin dosage. Dr. Guptill's notes from August 14, 2001, nearly a year after the alleged onset of disability, indicate that he discouraged Lacroix's application for disability benefits, a stance inconsistent with an opinion of disability. It was permissible to make a common-sense judgment that these observations were inconsistent with the total disability implied by the Residual Functional Capacity Questionnaire. Moreover, the hearing officer reasonably noted that these comparatively less severe evaluations occurred in spite of Lacroix's failure to engage in the physical and mental therapy that her doctors recommended. Thus, if her condition was less severe than the Residual Functional Capacity Questionnaire suggested, despite her failure to take recommended steps to improve it, it would be all the more reasonable to conclude that she should be capable of doing sedentary work.

As to failed back syndrome and post femoral rodding status, to the extent that Dr. Guptill considered these to be significant, that is presumably reflected in the Residual Functional Capacity Questionnaire. The fact remains that in her early visits with Dr. Guptill, he did not think applying for disability was appropriate, and in the last visit her overall condition was "under excellent control," she was becoming more active, and she wanted to decrease her medication. Although this Court might have reached a different conclusion on this record, the Commissioner's determinations in this area were based on substantial evidence.

The Court notes, as a final matter, that the Residual Functional Capacity Questionnaire suggested higher levels of impairment than any of the medical evaluations in the record. The Commissioner's decision is therefore consistent with a reasonable interpretation of the evidence in the record as a whole.

### 3. Lacroix's Testimony Regarding Her Subjective Pain

Lacroix next argues that the hearing officer erred in ignoring her subjective statements regarding pain. Pl.'s Mem. at 10. As she correctly points out, a hearing officer must consider a claimant's subjective assertion of pain by examining six factors:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;

4. Treatment, other than medication, for relief of pain;

5. Functional restrictions; and

6. The claimant's daily activities.

*Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 28–29 (1st Cir.1986). Where a proper *Avery* analysis has not been performed, the "determination . . . [is] analytically flawed," and must be reversed as not based on substantial evidence. *Rohrberg v. Apfel*, 26 F.Supp.2d 303, 309 (D.Mass.1998)(Freedman, J.) (citing *Corchado v. Shalala*, 953 F.Supp. 12, 15).

Again, however, Lacroix argues on the assumption that the hearing officer rejected her testimony regarding subjective pain altogether. In fact, the hearing officer found that she was suffering from fibromyalgia, and that her pain and other limitations were such that she could only do sedentary work. At the same time, the hearing officer "did not find her wholly credible" regarding the severity of her pain and limitations. He made this assessment based on the medical record, and there can be little doubt that the Commissioner is not required to credit testimony

that is not supported by the medical evidence. *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 194–95 (1st Cir.1987). Although Lacroix correctly faults the hearing officer's reliance on the absence of objective indicia of fibromyalgia—there are no objective tests for fibromyalgia, *see Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir.1996), Lacroix's own subjective description of her symptoms to Dr. Guptill and to other physicians indicated that her fibromyalgia was "under excellent control" and that her activity level was increasing. Although "statements of pain consistent with the objective medical findings may not be found incredible merely because they assert a level of pain beyond that reasonably indicated by the findings," *Waters v. Bowen*, 709 F.Supp. 278, 282 (D.Mass.1989), here there was conflict between what examining physicians witnessed and what Lacroix described to them, on the one hand, and what she described in her testimony, on the other.

By and large, the hearing officer gave adequate attention to all of the relevant *Avery* factors, with the exception of "type, dosage, effectiveness, and adverse side-effects of any pain medication." *Avery*, 797 F.2d at 29. The Commissioner acknowledges this omission, but points out that Lacroix did little more than briefly mention that the medications made her sleepy and affected her memory, concentration, and ability to drive, without further developing the issue during her testimony. Def.'s Mem. at 18 (citing R. at 32). There is no evidence in the record of her telling a physician about experiencing side effects from her medication, and the Residual Functional Capacity Questionnaire does not list any side effects. R. at 247. Moreover, the hearing officer found that Lacroix's depression impacted her concentration and memory, and Lacroix's testimony was insufficient to suggest that any medication-induced limitations in that area were greater than what was suggested on the Mental Residual Functional Capacity Form. As for driving, she gave conflicting testimony, acknowledging that she did drive sometimes. There are no grounds for reversal here.

## 4. Cumulative Effect of Exertional and Nonexertional Impairments

██ Lacroix next argues that the hearing officer did not consider the combination of her impairments, but rather focused primarily on her mental limitations. Pl.'s Mem. at 17. It is true that claimants who suffer from both exertional and nonexertional impairments "should be considered differently from claims of individuals who have solely physical ailments." *Anderson*, 634 F.Supp. at 971 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2) (1982)). Here, however, the hearing officer plainly considered both her physical and mental impairments. He determined the level of exertion of which she was capable, given her physical impairments, he determined her mental limitations, and then asked the vocational expert hypothetical questions based on both classes of impairments.

## 5. Application of the Grids

Lacroix next alleges that the hearing officer erred in applying the "Grids" in this case, Pl.'s Mem. at 18, because when a claimant has a combination of impairments, "the Grid will offer only guidance—it will not determine 'disability.'" *Anderson*, 634 F.Supp. at 971 (quoting *Sherwin v. Sec'y of Health & Human Servs.*, 685 F.2d 1, 4 (1st Cir.1982)) (internal quotation marks omitted). Although it is true that the hearing officer twice made reference to Grid Rule 201.28, he made clear that he used the Grids as a framework for decision-making, rather than rigidly performing algorithms with them. R. at 21–22. He gave thorough consideration

to the medical evidence and to hearing testimony by Lacroix and Sabella, and there is nothing in the decision to indicate that he labored under the illusion that the Grids would dictate the result.

## III. CONCLUSION

Accordingly, Lacroix's Motion for Order Reversing the Decision of the Commissioner [Doc. No. 6] is DENIED, and the Commissioner's Motion for Order Affirming the Decision of the Commissioner [Doc. No. 8] is ALLOWED.

SO ORDERED.