**Theresa HARDIN, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 05–12415–WGY.**

United States District Court, D. Massachusetts.

Dec. 27, 2006.

Maria L. Nunez, Green & Greenberg, Providence, RI, for Plaintiff.

Michael P. Sady, United States Attorney's Office, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

The plaintiff Theresa Hardin ("Hardin") brings this action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). Hardin challenges the decision of the Administrative Law Judge ("hearing officer") denying her application for a Period of Disability, 42 U.S.C. § 416, Disability Insurance Benefits, 42 U.S.C. § 423, and Supplemental Security Income Benefits, 42 U.S.C. § 1382.

Hardin argues that the Commissioner's decision is legally and factually erroneous and not based upon substantial evidence. Accordingly, Hardin asks this court for a remand to the Commissioner for either a reversal and an award of Disability Insurance Benefits and Supplemental Security Income Benefits, or for further administrative proceedings.

## I. BACKGROUND

### A. Factual Background

Hardin, born July 18, 1957, is a forty-nine-year-old woman who lives with her daughter in Acushnet, Massachusetts. (Transcript of Social Security Proceedings [Doc. No. 13] at 10, 84, 596.) Hardin graduated from high school and attended various training seminars for counseling. (Tr. at 19, 84, 106, 111.) Her past relevant work experience has been as a grocery clerk and as a residential counselor at a substance abuse treatment center. (Tr. at 19, 75, 375–79.)

Hardin alleges that she became disabled and unable to work on May 3, 2000 as a result of depression, asthma, Hepatitis B and C, and back pain. (Tr. at 19, 83, 105, 555.) It was on May 3, 2000 that Hardin left her job as a counselor at a substance abuse facility because she was asked to resign due to frequent absences. (Tr. at

597.) Hardin also testified at her hearing that she processed applications at Boston University from January 2003 through March 2003, but that this was only a temporary job. (Tr. at 597–98.)

The record establishes that, between October 21, 1997 and November 9, 2000, Hardin frequently sought treatment from her primary care physician, Dr. Matthew Messina, at Hawthorn Medical Associates ("Hawthorn Medical"). (Tr. at 200–11, 225, 228–30.) She was also treated by a Dr. Andrew W. Artenstein. (Tr. at 216, 220–24, 226.) Hardin's medical problems during this time included asthma, depression, and sinusitis, while her symptoms consisted of congestion, coughing, wheezing, and sputum. (Tr. at 200–08, 225, 228–29.) Hardin was treated with inhalers and prednisone and was advised to quit smoking. (Tr. at 204–07, 210, 225.) Hardin reported that she felt better using the prednisone until the dosage was reduced to ten milligrams, at which time her symptoms returned. (Tr. at 206.)

Hawthorn Medical's notes during this time indicate that Hardin was struggling with heroin, cocaine, and marijuana abuse. (Tr. at 211, 214–15.) Hardin was losing weight due to depression, (Tr. at 210.), and she was fighting the urge to use drugs by trying to attend meetings for her addictions, (Tr. at 211, 214–15.) Counseling, rehabilitation, and detoxification did not seem to work because Hardin did succeed in quitting her drug abuse. (Tr. at 211–12, 214–15, 225–26.)

In January 2001, Hardin was treated at Hawthorn Medical for back pain resulting from shoveling snow. (Tr. at 231–32.) X-rays of the lumbar spine were generally normal with some facet arthritis at L5–S1. (Tr. at 136.) A magnetic resonance imaging scan ("MRI"), however, revealed a dorsal epidural abscess and abscess formation in the right paravertebral tissues. (Tr. at 233.)

At a February 27, 2001 examination by Dr. Matthew Frank Philips, Hardin stated that her back pain had dissipated and noted that the improvement occurred when she was taking an antibiotic for another condition. (Tr. at 138; 431.) Based on the MRI results and Hardin's statements, Dr. Philips concluded that Hardin had an epidural abscess. *Id.* On March 7, 2001, Dr. Philips did a biopsy, drained the abscess, and performed a decompression of the right L5 nerve root. (Tr. at 498–506.) At a follow-up visit on April 17, 2001, Hardin remarked that her back pain was significantly reduced, although Dr. Philips expressed concern at the recurrence of some minor symptoms. (Tr. at 140, 433.)

In January 2002, when Hardin complained of lower back pain and numbness in her feet, Dr. Messina referred her for another MRI, which showed improvement from her prior MRI with continuation of the mild diffuse disc bulging at L4/L5 and mild bilateral facet joint hypertrophy. (Tr. at 142–43.)

On February 15, 2002, Hardin returned to Hawthorn Medical because she was distraught over falling off the wagon. (Tr. at 253.) Dr. Messina noted that her asthma and respiratory problems were quite stable, but also stated that her mental status had deteriorated. *Id.* She was therefore referred to St. Luke's Hospital, where she stayed from March 11, 2002 to March 14, 2002. (Tr. at 144–47, 253, 507–10.) Hardin was discharged when she changed her mind about continuing a detoxification program. (Tr. at 144–47, 507–10.)

At another follow-up appointment at Hawthorn Medical on March 20, 2002, Hardin reported that her back was feeling better, but she was prescribed Klonopin and Percocet, and was referred to the Pain Clinic. (Tr. at 255.) Hawthorn Medical

treatment notes between April 10, 2002 and May 30, 2002 indicate that Hardin continued to be prescribed pain medication and continued to experience breathing problems with another prescribed prednisone taper. (Tr. at 259–67.) Hardin was referred back to the Pain Center on several occasions by her treating physicians, but on at least one occasion, August 20, 2002, Hardin informed Dr. Messina that she had cancelled an appointment because she felt well. (Tr. at 264, 269, 273, 299.)

Hawthorn Medical again referred Hardin to St. Luke's Hospital, and she was admitted from August 29, 2002 to September 3, 2002. (Tr. at 150–58, 515–17, 305–06.) Hardin's discharge summary from St. Luke's indicates that Hardin experienced substance induced mood disorder, cocaine dependence, marijuana abuse, lower back pain, hepatitis A and C, and asthma. (Tr. at 151, 154–55, 516.)

In September and October 2002, Hardin was treated for back pain, Temporomandibular Joint Disorder ("TMJ"), and additional breathing problems. (Tr. at 159–60, 307–12.) Blood tests conducted on October 8, 2002 showed that Hardin's viral load was high. (Tr. at 310.) Additional Hawthorn Medical treatment notes from October 17, 2002 state that Hardin was doing well at drug court, attending counseling and group sessions. (Tr. at 312.)

Dr. Jersey Chen first examined Hardin on December 9, 2002 at Beth Israel Deaconess Medical Center ("Beth Israel") for the purpose of establishing a primary care relationship. (Tr. at 337–40.) This examination coincided with Hardin's move to the Grenada House, a residential drug treatment center in Allston, Massachusetts. (Tr. at 337.) During her appointment with Dr. Chen, Hardin stated that she had a history of asthma, but her condition had been stable, and that she experienced chronic back pain. *Id.* Dr. Chen also not-

ed Hardin's statement that her back pain was stable and managed by medication, and he referred her to the Pain Clinic for adjustment of her non-narcotic pain regimen, advising her to take Motrin as needed. (Tr. at 339.) In addition, Dr. Chen refilled Hardin's inhaler prescriptions and prescribed a nicotine patch to help her quit smoking. (Tr. at 340.)

At examinations on January 6, 2003 and January 27, 2003, Hardin complained of shortness of breath, but her back pain was improving. (Tr. at 358, 360.) Hardin's gait was within normal limits, reflexes were 2+ in the knees and ankles, and her sensation to light touch in the lower extremities bilaterally was intact. *Id.*

On January 30, 2003, Hardin was psychologically evaluated by Richard Stellar at the request of the Massachusetts Rehabilitation Commission, Disability Determination Services. (Tr. at 168–73.) At this time, Hardin was living in the residential treatment center and she had attained three months of sobriety. (Tr. at 168.) Stellar's notes indicated that Hardin was also working twenty hours per week and experiencing fatigue as a result. (Tr. at 168, 172.)

Hardin reported to Stellar that she had been sexually abused by her father from the ages of ten to seventeen. (Tr. at 168–69.) Hardin also stated that she had been involved with drugs from age twelve to age thirty-three. (Tr. at 170.) She had been sober from approximately 1990 to 2000 but had relapsed and was now attempting to get clean again. *Id.* Hardin stated that most of her current activities involved treatment, including attending counseling sessions, Alcoholics Anonymous meetings, Narcotics Anonymous meetings, and doctors' appointments. (Tr. at 169.) Hardin told Stellar that she liked to read, watch television and movies, and though she did not have any close friends, she did get

along with the other residents. *Id.* Since her drug relapse in 2000, Hardin experienced memory and concentration problems, as well as anxiety and flashbacks to her sexual abuse. (Tr. at 170.)

A mental status examination revealed that Hardin was oriented in all spheres and had a full fund of personal and current information. (Tr. at 171–72.) She appeared somewhat anxious, but responded well to questions and was able to relate appropriately. *Id.* Stellar remarked that Hardin had symptoms consistent with Post Traumatic Stress Disorder ("PTSD") and depression. (Tr. at 172.)

Approximately one week later, on February 6, 2003, Dr. E. Lynch, a Disability Determination Services psychological consultant, reviewed Hardin's medical records and made the following conclusions: (1) Hardin was able to remember and carry out complex tasks; (2) Hardin was able to persist, maintain pace, and concentrate for two hours in an eight hour day with breaks; (3) Hardin was not limited in social interactions; and (4) Hardin could manage routine stress. (Tr. at 190.) Five days later, on February 11, 2003, Dr. Gary R. Brissette, another Disability Determination Services medical consultant, concluded that Hardin was able to perform light work. (Tr. at 193–98.) These findings were confirmed by June 2003. (Tr. at 327–35, 403, 387–405.)

Throughout February, March, and April 2003, Beth Israel treatment notes show that Hardin frequently presented with symptoms of shortness of breath, fatigue, wheezing, and sputum. (Tr. at 313, 362, 364, 367–70, 375–77, 477–80, 485–87, 491–92.) CT scans and pulmonary examinations generally showed no abnormalities, but Hardin's medication was changed and she was again advised to quit smoking. (Tr. at 313–14, 362–63, 365–66, 496–97.) Beth Israel also performed psychiatric evaluations in March and April 2003. (Tr. at 371–74, 378–80, 481–84, 488–90.) Hardin stated that she experienced depression, anxiety, and PTSD as a result of sexual abuse by her father. (Tr. at 371, 481.) She also had racing thoughts and was easily distracted. (Tr. at 379, 489.) The Beth Israel psychiatrists described Hardin as agitated with mood disorder, cocaine dependence and abuse in early full remission, anxiety disorder, and PTSD. (Tr. at 373, 379, 483, 489.) Prednisone and a mood stabilizer were added to Hardin's medication regimen. (Tr. at 313–14, 380, 490.)

On October 16, 2003, Hardin returned to Dr. Philips with persistent back pain. (Tr. at 435.) Hardin stated that she experienced numbness and tingling in her legs. *Id.* Examination revealed positive straight leg raising but decreased range of motion of the back and slight tenderness to the touch over the paraspinal muscle regions with bilateral paraspinal muscle spasm. *Id.* After reviewing an MRI of Hardin's lumbar spine from about a month earlier, Dr. Philips diagnosed a degenerative disc disease at L4–L5 with loss of disc space height and loss of water content, facet arthropathy and postoperative changes in the right L4–L5 facet joint, reactive endplate changes at L4–L5, and a right paracentral disc herniation at L4–L5 compromising the right L4 nerve root. *Id.* Dr. Philips recommended conservative treatment of Hardin's back condition including spinal therapy and orthosis *Id.*

On October 22, 2003, Hardin underwent a liver biopsy to confirm her hepatitis C and to rule out cirrhosis of the liver (Tr. at 518–19.) Additionally, on November 18, 2003, Hardin underwent a right L4–L5 facet joint injection to address her back pain. (Tr. at 520–21.)

Hardin was admitted to St. Luke's Hospital on December 29, 2003 because she was unable to walk or get comfortable.

(Tr. at 520–23.) Dr. Messina discharged her on December 31, 2003 and noted that she was greatly improved and able to perform her activities of daily living. (Tr. at 522.) On January 6, 2004, however, Hardin was readmitted to St. Luke's with increased back pain, generalized weakness, lethargy, lightheadedness, bladder dysfunction, and fever. (Tr. at 527–30.) An MRI of Hardin's lumbar spine showed an epidural mass at L3–L4. (Tr. at 524.) Dr. Philips performed bilateral L4 laminectomies with evacuation of an epidural abscess at L3–L4. (Tr. at 524–25.)

A culture of the abscess grew out Staphylococcus aureus and Hardin was treated with intravenous antibiotics. (Tr. at 530.) As her condition improved and became stable, Hardin was discharged home on January 19, 2004 with the diagnoses of lumbar epidural abscess and bilateral L4/5 laminectomies with evacuation of L3–L4 epidural abscess with microdissection. (Tr. at 531–32.)

At her follow-up examination with Dr. Philips on January 22, 2004, Hardin stated that she still had back pain and requested Percocet. (Tr. at 436.) Dr. Philips observed that she was ambulating well. _Id._ One week later, Hardin reported continued back pain, but the pain down her legs had gone away. (Tr. at 437.) Dr. Philips referred Hardin to the Pain Clinic for pain management. _Id._ Less than one week later, Hardin presented with increased back pain, worse in the morning, noting also that the medication was helping with pain relief. (Tr. at 438.)

Dr. Philips wrote a letter to Dr. Messina on February 17, 2004, explaining that Hardin's surgical incision was well-healed and did not exhibit tenderness to palpation, though she did have bilateral paraspinal muscle spasm. (Tr. at 439.) Dr. Philips recommended a continued regimen of antibiotics and suggested an MRI to monitor the re-accumulation of the abscess. _Id._ In a separate letter dated March 2, 2004, Dr. Philips added that he felt Hardin would need further surgical reconstruction to stabilize her lumbar spine. (Tr. at 440.)

On March 30, 2004, Hardin informed Dr. Philips that her back pain was tolerable and that she only needed the back brace for housework and excessive activity. (Tr. at 442.) She denied any significant lower extremity pain. _Id._ About two weeks later, on April 12, 2004, Hardin telephoned Dr. Philips' office requesting pain medication because the Pain Clinic did not have physicians working that day and had therefore referred her to Dr. Philips. _Id._ Dr. Philips' staff contacted the Pain Clinic, who denied that they had referred Hardin to Dr. Philips. _Id._ The Pain Clinic recommended that Hardin take Tylenol and Ultram until her medications could be reviewed at her appointment the following week. _Id._

On August 6, 2004, Hardin sought detoxification at St. Luke's Hospital. (Tr. at 537–38.) She was admitted three days later to the Highpoint Treatment Center for opiate and cocaine abuse as well as depression. (Tr. at 443–451.) Hardin had relapsed in her drug abuse in May 2004 and she was using cocaine almost daily. (Tr. at 443.) She reported problems with short term memory, sleep, appetite, concentration, and energy. (Tr. at 446, 450, 454.) Hardin stated that she had been depressed since May 2004, and it was noted that she was being treated for bipolar disorder, depression, PTSD, and cocaine and opiate dependence. (Tr. at 443, 445, 450.)

With regard to Hardin's employment history, it was noted that her drug abuse had sometimes interfered, but that she currently worked occasionally at a flea market. (Tr. at 448.) Hardin further stated that for leisure activities she went

to the beach, read, watched movies, cooked, and cleaned. *Id.*

A mental status exam showed that Hardin was alert and cooperative but also agitated and anxious. (Tr. at 444, 454.) Her judgment and memory were unimpaired, and she denied suicidal ideation. (Tr. at 454.) Against medical advice, Hardin left the treatment center less than a week later on August 15, 2004 when her request for methadone maintenance was not met. (Tr. at 444, 459.) Upon discharge, Hardin was alert and oriented, and she was not suicidal or psychotic. (Tr. at 459.)

On January 15, 2005, Dr. Douglas Griffiths, Hardin's treating psychiatrist between May 15, 2003 and June 15, 2004, stated his opinion that Hardin was unable to work due to bipolar disorder. (Tr. at 409–412.) Dr. Griffiths suggested that Hardin's disabling bipolar disorder was separate and apart from her substance abuse. (Tr. at 412–13.) Dr. Griffiths opined that Hardin was severely impaired in her ability to understand, remember and carry out instructions, in her ability to respond appropriately to supervisors, in her ability to respond to customary work pressures, and in her ability to perform varied tasks. (Tr. at 410–11.) Additionally, Dr. Griffiths rated Hardin's limitations as moderately severe in her ability to perform daily activities, ability to respond to supervision, and ability to carry out complex or repetitive tasks. *Id.*

On January 17, 2005, Karen Caddell, a nurse practitioner at Southcoast Neurosurgery, stated in a questionnaire that Hardin was unable to work due to moderate to severe symptoms from degenerative disc disease. (Tr. at 414–15.) Ms. Caddell was of the opinion that Hardin's pain was so severe that she was precluded from sustaining the concentration and productivity needed for full-time employment. (Tr. at 416.)

On February 17, 2005, Hardin was psychologically evaluated by Dr. Charles Howland who noted that her affect was constricted and her mood was depressed. (Tr. at 540.) Dr. Howland also noted Hardin's flashbacks to early childhood sexual abuse, frequent crying spells, feeling of hopelessness, and occasional episodes of hypomania. (Tr. at 539–40.) Based on this evaluation, Dr. Howland diagnosed Hardin with chronic bipolar II disorder, opioid and cocaine dependence, PTSD, and personality disorder with dependant and avoidant features. (Tr. at 546–47.) Dr. Howland was of opinion that Hardin was severely limited in her ability to respond appropriately to supervision, customary work pressures, and in her ability to perform complex tasks. (Tr. at 548–49.)

On March 2, 2005, Dr. Stuart Gitlow, a board certified physician in psychiatry and addiction medication, testified at Hardin's administrative hearing as a medical expert. (Tr. at 576, 584–96, 617–21.) Dr. Gitlow testified that he had reviewed all of the evidence of record and he unequivocally agreed with the diagnosis of opioid and cocaine dependence. (Tr. at 584, 586–87.)

Dr. Gitlow further stated that Hardin most likely suffered from PTSD, but it was less likely that she suffered from bipolar II disorder because cocaine use over an extended period can cause an equally extensive period of mood instability. (Tr. at 586–87.) It was therefore difficult for Dr. Gitlow to determine whether Hardin had experienced true episodes of hypomania. (Tr. at 584, 586–87.) Dr. Gitlow noted that during periods of sobriety, Hardin was able to work without evidence of any significant functional impairment. (Tr. at 586–87.) According to Dr. Gitlow, Hardin worked for ten years in a setting that required normal levels of social function-

ing, concentration, persistence, pace, and activities of daily living. (Tr. at 587.) When asked to assess Hardin's functional limitations, Dr. Gitlow testified that she would have mild difficulties with social functioning; mild to moderate difficulties with concentration, persistence, and pace; and no episodes of decompression in the absence of substance abuse. (Tr. at 588–89.)

On March 31, 2005, Hardin returned to Southcoast Neurosurgery stating that she wanted to restart physical therapy for her back. (Tr. at 551.) She requested prescriptions for pain medications. *Id.* On examination, Hardin's back exhibited full range of motion without tenderness or spasm and she was able to quickly transition from sitting to standing. *Id.* Hardin was diagnosed with back pain and advised to continue with physical therapy. (Tr. at 551–52.) At a follow up visit on May 17, 2005, Hardin complained of lower back pain with intermittent radiation into her legs, but it was noted that her symptoms were not as severe. (Tr. at 553.) Once again, she exhibited full range of motion without tenderness or spasm and she was able to transition quickly from sitting to standing. (Tr. at 553–54.) Hardin was diagnosed with back pain and referred to physical therapy. (Tr. at 554.)

## B. Procedural History

On December 2, 2002, Hardin filed for Disability Insurance Benefits pursuant to Title II of the Social Security Act. (Tr. at 83–86.) The claim was denied initially on February 25, 2003 by the regional commissioner of the Social Security Administration. (Tr. at 33–37.) Upon request for consideration, the administration reevaluated Hardin's application and denied it again on June 24, 2003. (Tr. at 39–41.) Hardin timely appealed on October 10, 2003 and was initially scheduled for a hear-

ing on November 16, 2004. (Tr. at 42–43, 52.) Subsequent to two postponements, an oral hearing was held on March 2, 2005 before Administrative Law Judge Barry H. Best. (Tr. at 18, 64–70, 573, 576.) After the hearing and review of the evidence, the hearing officer found her not disabled within the meaning of the Social Security Act and denied Hardin's claim on July 28, 2005. (Tr. at 18–30.)

Following the unfavorable decision, Hardin petitioned the Social Security Appeals Council for a review of the hearing officer's decision. (Tr. at 14.) The Appeals Council denied Hardin's request for review, making the hearing officer's decision the final decision of the Commissioner and rendering the matter amendable to judicial review. (Tr. at 10–13.) On November 25, 2005, Hardin filed the instant action with this Court to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g). (Pl.'s Compl. [Doc. No. 2] ¶¶ 1–4.)

## II. ANALYSIS

### A. Disability Determination

#### 1. Standard of Review

Review of the Commissioner's Social Security determination is limited by section 405(g) of the Social Security Act, which provides that, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *see also Manso–Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The substantial evidence standard is satisfied when, "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Irlanda Ortiz v. Sec'y of Health and Human Servs.*, 955

F.2d 765, 769 (1st Cir.1991) (quoting *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981)). Furthermore, factual inferences, credibility determinations, and resolutions of conflicts in the evidence are reserved to the Commissioner. *Id.* Accordingly, this Court must affirm the Commissioner's denial, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan v. Sec'y of Health and Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987).

### 2. Social Security Disability Standard

As the claimant, Hardin bears the initial burden of showing that she is disabled within the meaning of the Social Security Act. *Deblois v. Sec'y of Health and Human Servs.*, 686 F.2d 76, 79 (1st Cir.1982). An individual is considered disabled if she is unable, "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Evidence of impairment is not in itself enough to warrant an award of benefits. *See McDonald v. Sec'y of Health and Human Servs.*, 795 F.2d 1118, 1120 (1st Cir. 1986). The Social Security Act further provides that a disability determination is warranted "only if [her] physical or mental impairment or impairments are of such severity that [s] he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience. 20 C.F.R. § 404.1520.

### 3. The Hearing Officer's Decision

The hearing officer made the following findings: (1) Hardin had not engaged in substantial gainful activity since the alleged onset of disability (i.e., May 3, 2000), (Tr. at 29;) (2) Hardin's post traumatic stress disorder, substance abuse disorder, asthma, and back disorder were "severe," but did not meet or equal the criteria of any of the impairments listed in Appendix 1 to Subpart P of Regulation No. 4 entitled "Listing of Impairments," *id.;* and (3) Hardin's allegations regarding her limitations were not totally credible in light of the medical evidence presented, *id.*

The hearing officer concluded that Hardin had the residual functional capacity to perform a wide range of sedentary exertion with pulmonary restrictions. (Tr. at 29–30.) Although Hardin's impairments prevented her from performing any of her past relevant work, the hearing officer found that Hardin could perform work as a cashier, cafeteria worker, lottery ticket seller, or as an assembler/packager in the electronics or jewelry industry. (Tr. at 30.) Accordingly, the hearing officer found Hardin not disabled as defined by the Social Security Act. *Id.*

### 4. Challenge to the Hearing Officer's Decision

Hardin raises two challenges to the hearing officer's decision: the hearing officer (1) failed to follow the proper standards for evaluating Hardin's back pain; and (2) failed to support his decision by substantial evidence in the record. (Pl.'s Br. [Doc. No. 15] at 16, 19.)

### a. Evaluation of Back Pain Evidence

Hardin argues that the hearing officer's decision is not supported by substantial evidence because the hearing officer did not follow the proper procedures as set forth in *Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19 (1st Cir.1986) and *Social Security Ruling ("S.S.R.")* 96–7p, when evaluating Hardin's pain and credibility. (Pl.'s Br. at 17–19.) Specifically, Hardin avers that the hearing officer erred because he failed to note in his decision that Hardin's pain varied in intensity, required use of a back brace, was exacerbated by activity, and could not be treated with narcotic pain medication due to her substance abuse problems. (Pl.'s Br. at 18.) Hardin then concludes that the hearing officer's decision lacks the specific analysis required by agency policy and case law. (Pl.'s Br. at 18–19.) The hearing officer's decision, however, shows that he properly evaluated Hardin's subjective complaints of pain in accordance with the appropriate legal standards.

 In addition to objective medical reports, the hearing officer's determination of disability must take into account the subjective pain of the claimant that is reasonably consistent with the medical evidence. 20 C.F.R. § 404.1529; *S.S.R.* 96–7p. The hearing officer must evaluate subjective pain in accordance with the following six factors: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Lopes v. Barnhart*, 372 F.Supp.2d 185, 192 (D.Mass. 2005); *Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 27–30 (1st Cir. 1986). The hearing officer's findings and evaluation of these factors are entitled to deference due to his observation of the claimant, the evaluation of her demeanor, and the consideration of how the testimony fits in with the rest of the evidence, especially when supported by specific findings. *Frustaglia v. Sec'y of Health and Human Servs.*, 829 F.2d 192, 195 (1st Cir.1987).

 This Court has reviewed the entire record, and the findings on these factors are supported by substantial evidence. Regarding the first factor, Hardin alleges that the hearing officer did not assess how her pain varied from day-to-day, i.e., he did not specifically refer to the frequency and intensity of her pain. (Pl.'s Br. at 18.) The hearing officer did, however, note the variability of Hardin's pain as reflected in the medical records. For example, the hearing officer credited Hardin's complaints of back pain from "shoveling" on January 9, 2001, but later observed that her back pain was "minimal" on February 27, 2001. (Tr. at 21.) The hearing officer also recounted how Hardin assessed her back pain as "markedly reduced" on April 17, 2001, but then it got worse when she developed "tenderness in the feet" and pain in her "left back." (Tr. at 22.) According to the hearing officer, Hardin described her back as "improved" on July 11, 2001, "doing better" on July 15, 2002, but more pain and "intermittent finger numbness" was cited on August 20, 2002. *Id.* Similarly, Hardin's statement that her

back pain was "stable" on December 9, 2002 is contrasted with her admission to St. Luke's Hospital in December 2003 where she complained of inability to walk or get comfortable. *Id.*

Regarding the second and fourth factors, Hardin also argues that the hearing officer was in error because he did not take into account that Hardin's pain was exacerbated by physical activity and she required use of a back brace. (*See* Pl.'s Br. at 18.) A review of his decision, however, demonstrates that he acknowledged both of these elements. Specifically, the hearing officer recognized that Hardin "used a brace to do house work and excess activity," (Tr. at 22), and later that Hardin "wore a brace with housework and physical activity and had occasional hip, right leg, left leg, and right inner thigh pain," *id.* Therefore, the record clearly reflects that the hearing officer addressed the impact of physical activity upon Hardin's pain and how it required a back brace.

Lastly, on the third factor, Hardin alleges that the hearing officer's decision is flawed because he failed to consider that Hardin's pain could not be treated with narcotic medication due to her substance abuse problems. (*See* Pl.'s Br. at 18.) Although the hearing officer did not make this particular point in his decision, this is not error because the hearing officer adequately addressed the third factor by accurately describing Hardin's medication regimen as well as recounting how she admitted to Dr. Chen that her back pain was stable on antibiotic, non-narcotic medication. (Tr. at 22, 26–27.) In addition, the hearing officer did not rely on Hardin's use of non-narcotic pain medications when finding that her complaints of pain were not entirely credible. *Id.* Furthermore, even if this omission amounted to a failure to consider one of the six *Avery* factors, it would not be reversible error.

*See Lopes v. Barnhart,* 372 F.Supp.2d 185, 192 (D.Mass.2005) (citing *Lacroix v. Barnhart,* 352 F.Supp.2d 100, 115 (D.Mass. 2005)). Therefore, the failure specifically to mention that Hardin could not utilize narcotic pain medication was not prejudicial and no error exists on this ground.

**b. Substantial Evidence in the Record**

██ Hardin argues that the hearing officer's decision to deny her application for disability benefits is not supported by substantial evidence. (Pl.'s Br. at 19.) In support of this argument, Hardin makes four principal claims: (1) the opinion of the nurse practitioner supports a finding of disability; (2) the opinion of the treating psychiatrist supports a finding of disability; (3) the frequency of her upper respiratory illness would prevent her from working at least three days per month; and (4) the vocational expert's testimony that Hardin has a moderately severe limitation in her ability to concentrate during a five-day work week precludes employment. *Id.* A review of the record in light of these claims, however, demonstrates that the hearing officer's decision was based upon substantial evidence.

**i. Nurse Practitioner Opinion**

The hearing officer properly afforded little weight to the opinions of Hardin's nurse practitioner, Karen Caddell. On January 17, 2005, Nurse Caddell stated that Hardin's degenerative disc disease, along with her severe symptoms of pain and neuropathy, prevented her from performing basic work activities. (Tr. at 414–16.) The hearing officer correctly noted that the only evidence of neuropathy was Hardin's statement about occasional numbness and tingling in her legs. (Tr. at 27, 435.) Nurse Caddell's conclusions were further undermined by the fact that no

doctor found Hardin unable to work due to orthopedic issues. (Tr. at 27.) The hearing officer properly gave limited weight to Nurse Caddell's opinion since it was not supported by the evidence of record.

Even if Nurse Caddell's opinions were not belied by the record, the Social Security Regulations do not require that more weight be given to her opinion. The regulations provide a detailed explanation of how the Commissioner evaluates and weighs medical opinion evidence. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). The medical opinions of "treating sources" are given "more weight" than non-treating sources and are even given "controlling weight" if certain conditions are met. *Id.* §§ 404.1527(d), 416.927(d). A "treating source" is defined as a "physician, psychologist, or other acceptable medical source" who treats the claimant. *Id.* §§ 404.1502, 416.902; *see also S.S.R.* 06–03p, 71 Fed. Reg. 45,593, 45,594 (Aug. 9, 2006) ("[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."). Similarly, "medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2); *see also S.S.R.* 06–03p, 71 Fed.Reg. at 45,594 ("[O]nly 'acceptable medical sources' can give us medical opinions.").

As such, Nurse Caddell is not a physician, psychologist, or other acceptable medical source as defined by the Regulations. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (excluding therapists and nurse practitioners from the list of acceptable medical sources). Thus, Nurse Caddell was not a treating source, and her opinion was not entitled to greater weight.

### ii. Psychiatrist Opinion

■ In addition to reviewing the evidence regarding Hardin's physical limitations, the hearing officer carefully considered the evidence of her mental impairments. As to these issues, Hardin contends that the hearing officer failed to give controlling weight to the opinion rendered by Dr. Douglas Griffiths, Hardin's reported treating psychiatrist. (Pl.'s Br. at 19.) Dr. Griffiths opined that Hardin's bipolar disorder causes symptoms separate and apart from her substance abuse that preclude her from maintaining gainful employment. (Tr. at 412–13.) The hearing officer noted that the symptoms attributed to Hardin's bipolar disorder, including sleep disturbance, disorganization, and poor concentration, were not evidenced in the record except as related to substance abuse. (Tr. at 27.) It is the hearing officer's responsibility to resolve conflicting evidence, and his decision must be affirmed even if the record "arguably could justify a different conclusion, so long as it is supported by substantial evidence." *See Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 713, 98 L.Ed.2d 663 (1988) (citing *Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981)). A review of the record justifies the hearing officer's asserted nexus between bipolar disorder symptoms and substance abuse. (*See* Tr. at 145, 154, 253, 285, 409, 412–13, 443.) Therefore, the hearing officer's resolution of this evidentiary conflict is supported by substantial evidence, and he properly afforded little weight to Dr. Griffiths' assessment.

### iii. Frequency of Upper Respiratory Illness

■ Hardin also claims that the denial of her disability benefits is not supported

by substantial evidence because the frequency of her upper respiratory illnesses and need for treatment would result in at least three absences from work each month. (Pl.'s Br. at 19.) She relies on the testimony of the Vocational Expert who stated that three to four absences per month would preclude employment. (Tr. at 628.) Since the hypothetical was premised on an assumption rather than a fact, however, the hearing officer did not err in giving limited weight to the Vocational Expert's answer. *See Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir.1982) (stating that responses of vocational experts are relevant only to the extent offered in response to hypotheticals that correspond to medical evidence of record).

Further, the hearing officer properly noted that Hardin frequently reported relief of her respiratory symptoms with the use of antibiotic medication and steroids, and although her treating physicians repeatedly instructed her to quit smoking, Hardin testified at the hearing that she continued to smoke. (Tr. at 21, 205, 245–46, 250, 345, 369, 376, 613.) An impairment that can be controlled by treatment is not disabling. 20 C.F.R. § 404.1530. Similarly, Hardin cannot be found disabled by her asthma where she failed to follow the treatment prescribed by her physicians and offered no justifiable reason for not so doing. *See id.*

#### iv. Vocational Expert Testimony

Hardin also argues that the hearing officer's denial of social security benefits is not based upon substantial evidence because the vocational expert testified that her moderate to severe impairment in ability to attend and concentrate during two of the five workdays per week would prevent gainful employment. (Pl.'s Br. at 19.) Once again, however, the Vocational Expert's answer was in response to a hypothetical based on an assumption. (Tr. at 628.) In fact, the hearing officer found that Hardin would have only a moderate limitation in her ability to concentrate—a finding that Hardin does not challenge. (Tr. at 26.) The hearing officer was not required to adopt the expert's conclusion. *See Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir.1994); *Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982).

The hearing officer's decision that Hardin is not disabled because there are sedentary jobs in the national economy that she can perform despite her impairments is supported by substantial evidence.

### III. CONCLUSION

Accordingly, the decision of the Commissioner of Social Security is AFFIRMED.

SO ORDERED.